## STATE v. HECTOR CHAVIS and LEANDER JACOBS.

(Filed 14 December, 1949.)

**1. Homicide § 3—**

**2. Homicide § 5—**

The intentional killing of a human being with a deadly weapon implies malice, and if nothing else appears, constitutes murder in the second degree.

**3. Homicide § 16—**

Where the unlawful killing of a human being with a deadly weapon is established, the burden is upon the State to show premeditation and deliberation beyond a reasonable doubt in order to constitute the offense murder in the first degree.

**4. Homicide § 4c—**

Premeditation is thought beforehand for some length of time, however short; and deliberation means an act is done in a cool state of blood and not under the influence of a violent passion aroused suddenly by some lawful or just cause or legal provocation.

**5. Homicide § 21—**

In determining the question of premeditation and deliberation, the conduct of defendants, before and after, as well as at the time of, the homicide, and all attendant circumstances, are competent.

**6. Homicide § 4d—**

A murder committed in the perpetration or attempt to perpetrate a robbery or any felony is murder in the first degree, G.S. 14-17, and in such instance the State is not put to proof of premeditation and deliberation.

**7. Homicide § 2—**

Where there is a conspiracy between defendants to rob the deceased and the killing is perpetrated in the execution of such conspiracy, each conspirator is guilty of murder in the first degree.

**8. Homicide § 25—**

Evidence tending to show that defendants conspired to rob deceased and that they killed him with deadly weapons in the perpetration of the robbery, is sufficient to take the issue of their guilt of murder in the first degree to the jury.

**9. Criminal Law § 38d—**

Where there is testimony that certain photographs accurately depicted the position of the body of deceased as it was found after the homicide, such photographs are competent for the restricted purpose of illustrating the testimony of the witnesses in regard thereto.

**10. Homicide § 30—**

Where testimony of statements of defendants is to the effect that defendants beat deceased over the head with a pistol and shotgun, causing him to fall to the floor, and it appears that deceased was later found with his skull crushed where he had fallen, the admission of expert testimony that deceased died from skull fracture "caused by the blows from the pistol and shotgun" cannot be held prejudicial.

APPEAL by defendants from *Burney, J.,* at April Term, 1949, of ROBESON.

Criminal prosecution upon a bill of indictment containing two counts charging that on 5 April, 1949, Hector Chavis and Leander Jacobs, and another, one Worth Lee Chavis, (1) did commit the crime of burglary in the first degree in respect to the sleeping quarters of one Martin L. Blackwell in Robeson County, North Carolina, and (2) the crime of murder in the first degree of one Martin L. Blackwell.

The defendants, upon arraignment duly had, pleaded "Not guilty," and upon motion of counsel for Worth Lee Chavis the court allowed a severance, and proceeded with the trial only of the case against defendants Hector Chavis and Leander Jacobs.

Upon the trial in Superior Court the State offered evidence tending to show substantially this narrative of facts: On 5 April, 1949, Martin L. Blackwell, 79 years of age, resided in a building located on Highways 74 and 301, about 500 yards west of the corporate limits of the town of Lumberton, in Robeson County, North Carolina. The building consisted of two rooms. In the front room he operated a store with two counters, one on each side, with space between. He slept in the rear room. There was a front door, and a door connecting the two rooms, and another on the rear.

On the early morning of 6 April, 1949, the dead body of Martin L. Blackwell was found on the floor of the store in a pool of blood, near the front door and about equidistant from the counters, with head toward and about 4 feet from the front door, and the feet toward the rear. The head of the body was battered, bruised and cut, and the skull was dented, crushed and split in several places. And the body was clad only in "long-handle" underwear. The front door was locked. The back door was open, with the key in the lock on the inside, along with several other keys. The bed was disarranged. There was no blood in the bedroom, but leaving the sleeping quarters coming toward the front on the left, blood was spattered on the candy case, about four feet from the body, and where the body was lying blood was spattered on the left counter up to about three feet from the floor. About 18 inches beyond the head there was a hole, freshly made, in the floor. In this hole there was the wadding of a 12-gauge shotgun. There were El Reeso cigars on the floor behind

STATE v. CHAVIS.

the right counter as the store is entered from the front and some Peter Paul Mound's candy on this counter.

Two distinct sets of tracks led to the back fence—20 steps from the back door. There was an opening in the fence. Just beyond it there was a ditch about four feet wide, with about eight inches of water in it. In this water a pistol, a 38 Smith & Wesson short, and a bar of Peter Paul Mound candy were found. Just across the ditch there was a box of candy and an El Reeso cigar.

The tracks were followed by officers back toward Lumberton to a dance hall, 250 yards from the Blackwell store. Across the street in front of the dance hall there was a little path leading through the woods. Along this path coins amounting to 85 cents were found,—a 25c coin at the end of it. There a double-barrel shotgun, minus the stock, a box of Mound candy, two $1.00 bills, a jar of white liquor, a half-pint empty bottle, three empty cigar boxes, two empty candy boxes and some eight or ten El Reeso cigars were found. On the breach part of the gun and around the safety and under the trigger guard there was blood and what looked like bits of flesh. The stock of the gun was found about 100 yards away.

The State further offered testimony of witnesses tending to show that the defendants were together in the afternoon and evening of 5 April; that defendant Leander Jacobs wanted to buy an automobile that was offered to him for $25.00; that he was unsuccessful in obtaining the money; that thereafter the defendants made statements to Worth Lee Chavis that they knew where they could get some money; that while they were riding around in the automobile of Worth Lee Chavis they wanted to know if he would be with them; that he declined; that they had him let them out at a point about 100 yards from the Blackwell Store about a quarter to 9 o'clock; that about 10 o'clock that night the defendants appeared at a taxi stand in Lumberton and hired a taxi to take them to Pembroke,—paying therefor four $1.00 bills; that at that time defendant Leander Jacobs was wet practically all over; that on this trip defendant Hector Chavis was in a hurry to get to Pembroke; that at Pembroke and after 10 o'clock on same night defendants hired another taxi, paying therefor $3.00, to take them to Maxton; that then they both were observed to be wet from about waist on down; that arriving at Maxton they were seen to go straight to another taxi; that they hired another taxi, one paying $7.00 and the other $6.00, to take them;—Leander Jacobs to his sisters at Midway, about 8 miles from Maxton, and defendant Hector Chavis rode around with the taxi driver until near daybreak.

The State further offered testimony tending to show that defendant Hector Chavis said in the presence of Leander Jacobs, that after they left Worth Lee Chavis they went to the back of Mr. Blackwell's store; that Hector knocked on the door and Blackwell came to the door with his

gun in his hand and let them in; that before he let them in, he, Hector, told Mr. Blackwell his name; that Mr. Blackwell met them with his gun; that Leander Jacobs took the gun away from him, and hit him over the head with it several times; that Mr. Blackwell grabbed the sawed-off shotgun and that he, Hector Chavis, grabbed the shotgun away, and hit him several times with it; that they took the money to where the shotgun and half-gallon jar of whiskey were found and divided it; and that Mr. Blackwell was on the floor the last time they saw him.

And the State further offered evidence as to statements made by Leander Jacobs, in the presence of Hector Chavis, to the effect that Hector came out first; that where they went through the fence Hector fell over the scantling and into the ditch where the gun was found in the water; that Leander said to Hector that "We are both equally guilty, we both did the job together"; that they were talking on Fourth Street, and Hector said he knew where they could get some easy money,—at Mr. Blackwell's store,—they could go out and rob him; and that they got what money they could get around the store,—some in two or three different cigar boxes, and went on down where they left the gun and whiskey and candy and empty boxes, and divided the money.

The State offered other testimony which tended to corroborate and substantiate the statements of the defendants.

And from the testimony offered by the State there is evidence that on the night in question defendants were drinking.

At the close of the State's evidence, the court allowed defendants' motions for judgment as of nonsuit on the charge of burglary in the first degree. But the court overruled defendants' motions, aptly made, for judgment as of nonsuit as to the charge of murder in the first degree. Exceptions 14 and 15.

The defendants offered no evidence.

Verdict: As to defendant Hector Chavis—"Guilty of murder in the first degree"; and as to defendant Leander Jacobs—"Guilty of murder in the first degree."

Judgment: As to defendant Hector Chavis: Death by the administration and inhalation of lethal gas as provided by law; and as to defendant Leander Jacobs: Death by the administration and inhalation of lethal gas as provided by law.

The defendants, Hector Chavis and Leander Jacobs appeal to the Supreme Court, and assign error.

*Attorney-General McMullan and Assistant Attorney-General Moody for the State.*

*J. E. Carpenter for the defendants.*

WINBORNE, J. This case portrays an atrocious crime, and careful consideration of the assignments of error presented by defendants fails to reveal error for which the judgment from which appeal is taken should be disturbed. However, we advert to and treat specifically the main exceptions.

I. Assignments of error Nos. 10 and 11, covering Exceptions Nos. 14 and 15, relate to the ruling of the trial court in denying defendants' motions, aptly made, for judgment as of nonsuit as to murder in the first degree.

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. G.S. 14-17. *S. v. Hawkins,* 214 N.C. 326, 199 S.E. 284.

The intentional killing of a human being with a deadly weapon implies malice and, if nothing else appears, constitutes murder in the second degree. *S. v. Payne,* 213 N.C. 719, 197 S.E. 573.

"The additional elements of premeditation and deliberation necessary to constitute murder in the first degree, are not presumed from a killing with a deadly weapon. They must be established beyond a reasonable doubt, and found by the jury, before a verdict of murder in the first degree can be rendered against the prisoner." *S. v. Miller,* 197 N.C. 445, 149 S.E. 590; *S. v. Payne, supra; S. v. Hawkins, supra.*

" 'Premeditation means thought of beforehand' for some length of time, however short." *S. v. Benson,* 183 N.C. 795, 111 S.E. 869; *S. v. Hawkins, supra.* And it has been said that "deliberation means that the act is done in cool state of blood. It does not mean brooding over it or reflecting upon it for a week, a day or an hour, or any other appreciable length of time, but it means an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, aroused suddenly by some lawful or just cause or legal provocation." *S. v. Benson, supra; S. v. Hawkins, supra,* and cases cited.

And "in determining the question of premeditation and deliberation it is proper for the jury to take into consideration the conduct of the defendant, before and after, as well as at the time of, the homicide, and all attending circumstances," *Stacy, C. J.,* in *S. v. Evans,* 198 N.C. 82, 150 S.E. 678; *S. v. Hawkins, supra,* and cases cited.

Applying these principles, the evidence in the present case is abundantly sufficient to be submitted to the jury on the first degree murder charge.

Moreover, murder committed in the perpetration or attempt to perpetrate a robbery or other felony shall be deemed to be murder in the first degree. G.S. 14-17. See also *S. v. King,* 226 N.C. 241, 37 S.E. 2d 684,

and *S. v. Bennett,* 226 N.C. 82, 36 S.E. 2d 708, and cases cited. ·Thus, when a homicide is committed in the perpetration of robbery, the State is not put to the proof of premeditation and deliberation. In such event the law presumes premeditation and deliberation. Applying this principle, the evidence in the case in hand is sufficient to justify a finding by the jury, beyond a reasonable doubt, that the killing of the deceased by defendants was done in the perpetration of the crime of robbery.

And there is in this case evidence tending to show a conspiracy between defendants to rob the deceased, and that the killing was' perpetrated in the execution of such conspiracy. Where two or more persons conspire to rob another and he is killed by one of the conspirators in the perpetration, or attempted perpetration of the robbery, each, and all of the conspirators would be guilty of murder. *S. v. Bennett, supra,* and cases cited.

Applying these principles to the evidence shown in the case on appeal here under consideration, there is no error in submitting the case to the jury on the charge of murder in the first degree.

Indeed, a reading of the charge given to the jury by the trial judge fully and fairly presented the case—so much so, that defendants find no fault with it—and make no exception to any part of it.

II. Assignments of error Nos. 2 to 8, both inclusive, covering Exceptions 5 to 12, both inclusive, relate to photographs, referred to in the evidence as Exhibits A and B, and manifestly in evidence, pertaining to the location of the body of the deceased when found and seen on the floor of the store on the morning of 6 April, 1949, used in the course of the examination of witnesses for the State as to which in each instance in which objection was made, the court ruled that the photograph is allowed or is offered "for the purpose of allowing the witness to illustrate his testimony and no other purpose," and that "it is not substantive evidence." Moreover, there is testimony that the photographs are true representations of the position of the body as it was found in the store.

While the decisions of this Court uniformly hold that in the trial of cases, civil or criminal, in this State, photographs may not be admitted as substantive evidence, where there is evidence of the accuracy of a photograph, a witness may use it for the restricted purpose of explaining or illustrating to the jury his testimony relevant and material to some matter in controversy. See *S. v. Gardner,* 228 N.C. 567, 46 ·S.E. 2d 824, where the principle has been applied recently, and the. authorities in support of it are assembled. Hence it is not necessary to reiterate and repeat here what is said there. It is sufficient to say that the principle as there declared appears to have been applied properly here, and the use of the photographs properly restricted to the purpose of illustrating the testimony of the witnesses. Indeed, it does not appear that the testi-

mony sought to be illustrated is irrelevant and immaterial to the issue involved in the trial. Thus, the assignments of error presently under consideration are held to be without merit.

III. Assignment of error No. 9 covering Exception No. 13, is directed to the action of the court in overruling objection by defendant to an hypothetical question, based upon evidence, as to whether the medical expert has an opinion satisfactory to himself as to the cause of the death of deceased. The witness answered "I do." Then without objection the witness was asked, "What is that opinion?", and in answer thereto without objection, said, "He died from skull fracture caused by the blows from the pistol and shotgun." Thus the record fails to present exception to the answer which defendants now seek to contend was erroneously admitted. But, in any event, a reading of the evidence fails to show that defendants were prejudiced by the answer of the witness. Statements of defendants made to officers show that M. L. Blackwell was on his feet when defendants entered his store, that one beat him over the head with a pistol, and the other with a shotgun; that they left him on the floor; that he was later found where they left him; that his head and skull were split open and crushed; and that he was dead. In the light of this evidence, the cause of his death is unmistakable.

All other assignments of error, brought forward, have been given due consideration, and in them error is not made to appear.

Hence, in the judgment below, we find

No error.